**Blanche BUSH, etc., Plaintiff,**

v.

**HUMANA HEALTH PLAN OF ALABAMA, INC., et al., Defendants.**

**Civil Action No. 96–A–1378–N.**

United States District Court, M.D. Alabama, Northern Division.

Aug. 5, 1997.

Mark N. Chambless, Montgomery, AL, for Plaintiffs.

J. Allen Sydnor, Jr., Birmingham, AL, for Defendants.

## MEMORANDUM OPINION

ALBRITTON, District Judge.

### I. INTRODUCTION

This cause is before the court on the Motions for Summary Judgment filed by defendants Humana Health Care Plan of Alabama, Inc. ("Humana") and Rene Moret ("Moret") on March 20, 1997 and defendant Mental Health Network, Inc. ("MHN") on May 22, 1997 (collectively "the Defendants").

On July 29, 1996, Blanche Bush ("the Plaintiff"), by and through her parents and next of friends, Billy Bush and Melanie Bush ("the Bushes"), filed this action in the Circuit

Court of Montgomery County, Alabama. In the Complaint, the Plaintiff asserted eight state law claims against the Defendants (Counts One through Eight). On September 3, 1996, Humana and Moret filed a Notice of Removal to this court, to which MHN consented.

Motions for summary judgment on all of the Plaintiff's state law claims were filed by MHN on September 4, 1996 and Humana and Moret on November 13, 1996. On February 21, 1997, the court granted the Defendants' motions for summary judgment, finding that the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., pre-empts the Plaintiff's state law claims. The court did not address the two ERISA claims added by the Plaintiff's First Amended Complaint, filed on January 14, 1997, because the Defendants had not moved for summary judgment on these two claims.

The First Amended Complaint added the following two ERISA claims, Counts Nine and Ten, respectively: (1) a claim under 29 U.S.C. § 1132(a)(1)(B) to recover benefits under the terms of Billy Bush's employee benefit plan; and (2) a claim under 29 U.S.C. §§ 1132(a)(1)(A), (c), and (g)(1) to recover a copy of the plan in effect at all relevant times and to recover a fine of up to $100.00 per day from November 6, 1995 through July 31, 1996 and reasonable attorney fees and costs for failure to provide a copy of the plan. In their Motions for Summary Judgment now before the court, the Defendants contend that there is no material issue of fact and they are entitled to judgment as a matter of law on the two ERISA claims.

Jurisdiction is based on a federal question pursuant to 28 U.S.C. § 1331.

For the reasons stated below, this court finds that the Motions for Summary Judgment are due to be GRANTED.

## II. *FACTS*

Submissions before the court establish the following facts:

The Plaintiff, the adopted daughter of the Bushes, is a minor. Humana, a subsidiary of Humana, Inc., is a health maintenance organization. Moret is Humana's Executive Director and Chairman of its Grievance Committee. MHN was the provider of mental health services under Billy Bush's employee benefit plan with Humana.

From 1988 to 1992, Billy Bush was employed by Humana, Inc. at Humana Hospital East Montgomery. Through his employment at Humana Hospital East Montgomery, Billy Bush enrolled in an employee benefit plan with Humana. In 1993, Galen Health Care, Inc. acquired the Humana Hospital East Montgomery, renaming the facility East Montgomery Medical Center. Billy Bush continued his employment there and enrolled in an employee benefit plan with Humana. In 1994, Columbia/HCA Health Care Corporation ("Columbia") acquired the East Montgomery Medical Center, renaming it Columbia East Montgomery Medical Center. Billy Bush worked at Columbia East Montgomery Medical Center until July 1996. (Plaintiff's Reply Brief to Defendant Mental Health Network, at 5; Complaint; Paul Carmony Affidavit.)

Through his employment with Columbia, Billy Bush was offered enrollment in an employee benefit plan with Humana ("the Plan"). In or about December 1994, the Bushes were given a brochure ("the Brochure") that "contains only the major features of the [P]lan." (Complaint, ¶¶ 15–16.) The Brochure warns that it does not include all of the Plan's benefits and exclusions, and does not replace the Plan. Billy Bush enrolled himself and his family, including the Plaintiff, in the Plan for the 1995 calendar year by completing an enrollment form dated December 5, 1994. Immediately thereafter, Columbia began withdrawing some of Billy Bush's salary to pay part of the Plan's premiums. Billy Bush subsequently re-enrolled in the Plan for the 1996 calendar year.

Paul Carmony ("Carmony"), Manager of Humana's Contract Drafting Unit, testified that although Columbia did not approve a written version of the Plan until August 1996, the Plan still existed during 1995 and 1996 with no break in coverage. (Carmony Deposition, at 41–42, 50, 52.) Carmony further testified that during this transition time, when there was no written version of the Plan, Humana, Inc. had the Plan loaded on its computer system to process claims of Columbia East Montgomery Medical Center

employees and their dependents. (*Id* at 50.) Carmony stated by affidavit that the Plan was designated as Plan 002, Option 260, which was the same designation as the employee benefit plans that Billy Bush had at Humana Hospital East Montgomery and East Montgomery Medical Center. Carmony also stated that the Plan's mental health benefits were the same in 1994, 1995, and 1996 for Billy Bush and his family, and were no greater or less than those listed in the Brochure.[1]

In particular, during all relevant times the Plan covered both inpatient and outpatient mental health services. The Plan conditioned coverage of services to those received from or provided under the order, direction, or authorized approval of a member's primary care physician, except in a medical emergency. With respect to inpatient services, the Plan covered fifty percent of the reasonable costs of services relating to confinement in a hospital or psychiatric treatment program. The Plan limited such coverage to thirty days per calendar year and counted two partial hospitalization days as one confinement day. With respect to outpatient services, the Plan covered in full services in a hospital, psychiatric treatment program, or physician's office. The Plan limited this coverage to twenty visits per calendar year, counted a visit as one hour of care or treatment, and required a $20.00 co-payment per visit.

Due to the Plaintiff's development of severe mental and behavioral problems, on July 20, 1995 the Bushes took the Plaintiff to see their primary care physician, Dr. Robert H. Moon ("Dr. Moon"), who referred the Plaintiff to MHN for counseling. In August 1995, Dr. Taz Jones ("Dr. Jones") of MHN diagnosed the Plaintiff with Oppositional Defiant Disorder. On September 7, 1995, the Bushes took the Plaintiff to AGAPE, another counseling service. AGAPE counselors diagnosed the Plaintiff with Attachment Disorder. On September 11, 1995, the Bushes took the Plaintiff back to Dr. Jones, who referred the Plaintiff to Sharon D. Gary

("Gary") of Psychological Services of Memphis. The Plaintiff had four visits with Gary in late September and early October 1995, during which Gary diagnosed the Plaintiff with Reactive Attachment Disorder and referred her to the Attachment Center in Evergreen, Colorado for a two-week intensive therapy program. (Complaint, ¶¶ 20–24.)

The Bushes filed a claim with Humana for these mental health services. On November 1, 1995, MHN sent a letter to the Bushes denying coverage for the Plaintiff's treatment at the Attachment Center, stating that "long term care is excluded under your contract." On December 29, 1995, the Bushes filed a grievance with MHN and Humana. On February 8, 1996, after a grievance hearing was held, Moret sent a letter to the Bushes upholding the denial of coverage under the Plan for treatment at the Attachment Center, writing that "residential treatment is not a covered benefit." On the same day, pursuant to an arrangement by Humana and MHN, the Plaintiff saw Dr. T. Brian Kennedy ("Dr. Kennedy"), who diagnosed the Plaintiff as having Reactive Attachment Disorder. On March 28, 1996, MHN sent a letter to the Bushes stating that MHN would pay the total amount of the Plaintiff's treatment in Memphis, $1,650.00, less four $20.00 co-payments, but reiterated that MHN would not pay for the Attachment Center treatment.

In April 1996, the Bushes took the Plaintiff to the Attachment Center for a two-week intensive residential treatment program and a long-term residential treatment program. (Complaint, ¶ 43; Plaintiff's Reply Brief to Defendant Mental Health Network, at 7.) After submitting a grievance to the State of Alabama HMO Grievance Committee, on June 26, 1996 the State of Alabama Department of Public Health sent letters to Humana and the Bushes informing them that the HMO Grievance Committee could not "uphold the decision of Humana's Grievance Committee." However, this letter does not state any reason why the HMO Grievance

---

1. The Brochure states that "Benefits apply only to covered services ordered, authorized or approved by member's primary care physician." In relevant part, the mental health benefits listed in the Brochure include: (1) "Inpatient hospital and physician mental health services covered at 50 percent up to 30 days per calendar year"; and (2) "Outpatient mental health therapeutic services covered in full after a $20 co-payment per visit up to 20 visits per calendar year."

Committee could not uphold Humana's decision. On July 8, 1996, Moret sent a letter to the Bushes, writing that based on the HMO Grievance Committee's recommendation, the Plan would authorize payment of $4,000.00 to the Attachment Center, covering the cost of the initial two-week intensive therapy program, but would not pay for any further treatment because residential treatment and long-term care treatment are not covered benefits under the Plan. Humana subsequently paid $4,000.00 to the Attachment Center.

On July 29, 1996, the Plaintiff, by and through her parents, filed suit against the Defendants.

### III. *SUMMARY JUDGMENT STANDARD*

The purpose of a motion for summary judgment is to challenge the contention that a case presents a genuine issue of material fact necessitating a trial. *See Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). The moving party can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof *Id.* at 322–324, 106 S.Ct at 2552–53.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

genuine issue for trial.'" *Id.* at 324, 106 S.Ct at 2553. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. On the other hand, the evidence of the nonmoving party must be believed, and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

### IV. *DISCUSSION*

#### A. *Count Nine—The Recovery of Benefits Claim*

In Count Nine, the Plaintiff brings a claim to recover benefits for long-term residential treatment at the Attachment Center.[2] The Defendants contend that there is no material issue of fact and they are entitled to judgment as a matter of law.

Under 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary may recover benefits due to him or her under the terms of an employee benefit plan. Although ERISA does not set forth a standard to review decisions of a plan administrator or fiduciary, the Supreme Court has held that a range of standards may apply to benefits determinations under ERISA. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 107–09, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989). More specifically, the Eleventh Circuit "has adopted the following standards for reviewing administrators' plan interpretations: (1) de novo where the plan does not grant the administrator discretion; (2) arbitrary and capricious when the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." *Buckley v. Metropolitan Life*, 115 F.3d 936, 939 (11th Cir.1997) (per curiam) (citing *Marecek v. BellSouth Telecomms. Inc.*, 49 F.3d 702, 705 (11th Cir.1995)).

---

**2.** As stated, Humana eventually paid for the Plaintiff's treatment in Memphis, less four co-payments of $20.00, and for the initial two-week intensive therapy program at the Attachment Center.

In reviewing an administrator's decision concerning benefits, a court must conduct a de novo review "unless the plan expressly provides the administrator discretionary authority to make eligibility determinations or to construe the plan's terms." *Kirwan v. Marriott Corp.*, 10 F.3d 784, 788 (11th Cir.1994) (footnote omitted). Here, the Plan does not expressly provide the Plan's administrator with discretionary authority to determine eligibility or interpret the Plan. Thus, the court will review de novo the denial of coverage for the long-term residential treatment at the Attachment Center.

Among other reasons for denying benefits, the Defendants assert that the Attachment Center treatment is neither inpatient nor outpatient treatment, but is residential treatment and long-term residential treatment.[3] Thus, the Defendants assert that the Attachment Center treatment is not covered by the Plan based on the Plan's exclusion of any service, supply, care, or treatment that is not specifically listed in the Plan or a rider to the Plan. The Plaintiff does not contend that the Attachment Center treatment is inpatient or outpatient treatment, but, instead, states that "This program consist [sic] of two (2) weeks intensive residential treatment followed up with long-term residential treatment." (Plaintiff's Reply Brief to Defendant Mental Health Network, at 7. *See also* Plaintiff's Reply Brief to Defendant's Motion for Summary Judgment, at ¶¶ 94–97, 123, 127, 128–29; Billy Bush Affidavit.)

Because the Plaintiff and the Defendants refer to all treatment at the Attachment Center as some type of residential treatment—residential treatment or long-term residential treatment—and because there is

no affirmative evidence before the court to indicate that the two-week and long-term treatment programs are different in that one is inpatient and one is outpatient, even if the long-term residential treatment is considered inpatient or outpatient, the $4,000.00 that Humana paid to the Attachment Center exceeds the maximum amount of benefits available under the Plan; there is no rider to the Plan affecting mental health benefits. In particular, assuming that the Attachment Center treatment is considered inpatient treatment, the Plaintiff would be entitled to $2,000.00 (50% of the two-week treatment) plus $1,386.67 (based on a written invoice from the Attachment Center before the court, the Plaintiff's long-term treatment cost $5,200.00 per month; 30 days per calendar year minus 14 days of the initial two-week treatment = 16 days of coverable long-term treatment; 16 days of the long-term treatment = $2,773.33; 50% of that amount = $1,386.67), which is $613.33 less than Humana's $4,000.00 payment.[4] Alternatively, assuming that the Attachment Center treatment is considered outpatient treatment, because during the two-week residential treatment program a "child receives 24-hour a day therapeutic care," (*see* Attachment Center pamphlet of the two-week program, at 3), the Plaintiff would be entitled to $0.00 (because one hour of care or treatment constitutes one visit under the Plan, payment for 20 visits at the Attachment Center is calculated by: 24 visits × 14 days = 336 visits; $4,000.00 divided by 336 visits = $11.90/visit, less a $20.00 co-payment/visit; 20 visits are $11.90 × 20 = $238.00; $238.00 less $400.00 in co-payments = $162.00).[5] Therefore, pursuant to the terms of the Plan, the Plaintiff is not entitled to recover any payment for the long-term residential treatment at the Attachment Center.[6]

---

3. The Defendants also assert that the long-term residential treatment at the Attachment Center is excluded by the Plan because this non-emergency treatment was not received from or provided under the order, direction, or authorized approval of Dr. Moon, the Plaintiff's primary care physician. The Defendants further contend that the Attachment Center treatment is not covered by the Plan because it was provided out of network.

4. As stated, the Plan covered fifty percent of the reasonable costs of services relating to confinement in a hospital or psychiatric treatment program, up to 30 days per calendar year.

5. As stated, the Plan covered in full services in a hospital, psychiatric treatment program, or physician's office, up to twenty visits per calendar year, with one hour of care or treatment counting as one visit, and required a $20.00 co-payment per visit.

6. Because the court has found that the Plaintiff is not entitled to recover any benefits under the terms of the Plan, it is unnecessary for the court to examine whether this treatment is also not covered by the Plan due to not being received from or provided under the order, direction, or

The Plaintiff argues that irrespective of the Plan's terms, the Defendants must pay for the long-term residential treatment at the Attachment Center due to alleged ERISA violations.[7] Specifically, the Plaintiff submitted affirmative evidence that from January 1995 until August 1996, no written version of the Plan existed and no certificate of coverage was provided to Billy Bush. (Carmony Deposition, at 41–42; Billy Bush Affidavit.) If true, this would be an ERISA violation. *See* 29 U.S.C. § 1102(a)(1) (requiring every employee benefit plan to be "established and maintained pursuant to a written instrument"). The Plaintiff also submitted affirmative evidence that no summary plan description or benefits statement was provided to Billy Bush during this time. (Carmony Deposition, at 45–46; Billy Bush Affidavit.) The failure to provide this information violates ERISA. *See* 29 U.S.C. §§ 1021(a), 1022, 1024(b), 1025(a)(requiring a plan administrator to give a summary plan description and a benefits statement to each participant and beneficiary covered under an employee benefit plan).

The Plaintiff's assertion that benefits are automatically covered by an employee benefit plan if there is an ERISA violation is not supported by any authority. Upon independent review, the court has not found any authority to support the Plaintiff's assertion, but has found authority that undermines it.

The Eleventh Circuit follows the rule that violations of ERISA's requirements do not entitle plaintiffs to substantive relief unless "the quantity of [the] procedural violations . . . work a substantive harm." *Harris v. Pullman Standard, Inc.*, 809 F.2d 1495, 1499 (11th Cir.1987) (citing *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1353 (9th Cir.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985)).[8] Moreover, the Seventh Circuit observed that "Most courts that have considered the issue have held that the [plan administrator or fiduciary] must have acted in bad faith, actively concealed the benefit

plan, or otherwise prejudiced their employees by inducing their reliance on a faulty plan summary before recovery for procedural violations is warranted." *See Kreutzer v. A.O. Smith Corp.*, 951 F.2d 739, 743 (7th Cir.1991) (citing *Blau*, 748 F.2d at 1353; *Govoni v. Bricklayers, Masons & Plasterers Int'l Union of Am. Local No. 5 Pension Fund*, 732 F.2d 250, 252 (1st Cir.1984)).

In the case most on point to the instant action, *Hein v. TechAmerica Group, Inc.*, 17 F.3d 1278 (10th Cir.1994), Mr. Hein argued that his benefits should be fully vested as a matter of law because his employee pension benefit plan did not comply with ERISA's requirements of establishing or maintaining a written plan, *see* 29 U.S.C. § 1102(a)(1), or of disclosing a summary plan description. *See* 29 U.S.C. §§ 1021(a) and 1022(b). Mr. Hein further argued that because the plan failed to comply with these requirements, the employer "should not be able to impose 'unwritten, undisclosed restrictions' on benefits." *Hein*, 17 F.3d at 1280.

The Tenth Circuit initially observed that Mr. Hein did not appeal the trial court's factual findings that there were no promise of vesting and no benefits actually vested. The court in *Hein* then held that

[Mr. Hein]'s argument on the effect of ERISA's noncompliance fails to establish the benefit plan provided for vesting. Something more than just the failure of the employer to comply with its duties under ERISA is necessary to establish a right to alleged benefits. Otherwise, ERISA would be turned into a strict liability statute: any time the employer failed to comply with its duties under ERISA, an employee would receive any alleged benefit he or she claims they expected.

*Id.* (footnote omitted). Applying this holding, the Tenth Circuit found that Mr. Hein did not have vested rights under his employee pension benefit plan despite the fact that

authorized approval of Dr. Moon, and being provided out of network.

**7.** To support her claim to recover benefits, the Plaintiff also relied on alleged violations under Alabama law. However, Count Nine's ERISA claim is brought under federal, not state, law.

**8.** In *Harris*, the Eleventh Circuit held that the employer's interpretation of its benefits policy was arbitrary and capricious as a matter of law because the employer ignored the clear wording of the benefits policy, failed to provide copies of the benefits policy to all salaried employees, and lacked any formal claims procedure. 809 F.2d at 1499.

the plan did not comply with ERISA's requirements. *Id.* at 1280–81.

■ Here, even assuming that no written version of the Plan existed and no certificate of coverage, summary plan description, or benefits statement was provided to Billy Bush before the Plaintiff went to the Attachment Center, the quantity of these ERISA violations does not "work a substantive harm." *See Harris,* 809 F.2d at 1499 (citing *Blau,* 748 F.2d at 1353 (9th Cir.1984)). The Plaintiff's assertions that the Defendants acted fraudulently, wantonly, recklessly, deceitfully, misleadingly, negligently, outrageously, and in bad faith are all conclusory and are unsupported by any affirmative evidence. Similarly, there is no affirmative evidence before the court that any of the Defendants actively concealed any documents. Instead, affirmative evidence before the court indicates that because Columbia did not approve a written version of the Plan until August 1996, despite requests to do so, Humana could not provide Billy Bush with a written version of the Plan or a certificate of coverage. (Carmony Deposition; Pat Doehrman Affidavit.). Furthermore, there is no affirmative evidence before the court that the Plaintiff was prejudiced by the alleged ERISA violations. Carmony testified that the Plan still existed when there was no written version of it, with no break in coverage, and Humana, Inc. had the Plan loaded on its computer system to process claims of Columbia East Montgomery Medical Center employees and their dependents. Although his employer changed to Columbia, Carmony's affidavit indicates that the terms of Billy Bush's employee benefit plan did not change. Moreover, the Bushes received a copy of the Brochure, which lists mental health benefits no greater or less than those of the Plan, in or about December 1994, well before the Plaintiff went to the Attachment Center. (Complaint, ¶¶ 15–16; Carmony Affidavit.) On December 19, 1995, Pat Doehrman ("Doehrman"), Humana, Inc.'s former National Account Manager, faxed to the Bushes a copy of the identical mental health provisions listed in the Plan, also well before the Plaintiff went to the Attachment Center. (The Bushes' December 29, 1995 Letter to MHN and Humana; Doehrman Affidavit; Copy of the Faxed Provisions.) Consequent-ly, as with Mr. Hein, the Plaintiff is not entitled to recover any benefits based on alleged ERISA violations.

■ The Plaintiff also asserts that the Defendants should be estopped from denying payment for the long-term residential treatment because the Bushes brought the Plaintiff to the Attachment Center for this treatment based on an alleged referral by Dr. Kennedy, a MHN doctor. The Eleventh Circuit has established "a very narrow common law doctrine under ERISA for equitable estoppel when (1) the provisions of the plan at issue are ambiguous, and (2) representations are made which constitute an oral interpretation of the ambiguity." *Glass v. United of Omaha Life Ins. Co.,* 33 F.3d 1341, 1347 (11th Cir.1994) (citing *Kane v. Aetna Life Ins.,* 893 F.2d 1283, 1285–86 (11th Cir.1990)). However, the doctrine of estoppel is not available under ERISA for "oral modifications (as opposed to interpretations) or when the written plan is unambiguous." *Id.* (citing *Alday v. Container Corp. of Am.,* 906 F.2d 660, 666 (11th Cir.1990); *Nachwalter v. Christie,* 805 F.2d 956, 960 (11th Cir.1986)). "In order for a court to apply equitable estoppel, 'the party claiming the estoppel must have relied on its adversary's conduct in such a manner as to change his position for the worse, and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading.'" *Ferry v. Hayden,* 954 F.2d 658, 661–62 (11th Cir.1992) (quoting *Heckler v. Community Health Servs.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984)) (internal quotation omitted).

In this case, although it is unclear whether residential treatment and long-term residential treatment at the Attachment Center are considered inpatient or outpatient treatment, the Plan's mental health coverage is limited to inpatient and outpatient treatment. The Plan excludes any service, supply, care, or treatment that is not specifically listed in the Plan, and there is no rider to the Plan concerning mental health benefits. As stated, the court has found that even if the Attachment Center treatment is inpatient or outpatient treatment, the Plaintiff would not be

entitled to any further benefits based on the Plan's unambiguous limitations as to the length and amount of coverage for inpatient and outpatient mental health treatment.

■ Even if these coverage limitations were ambiguous, Dr. Kennedy's referral does not interpret any of these limitations. The only affirmative evidence before the court of Dr. Kennedy's alleged referral is a letter dated March 21, 1996 and a page of doctor's notes dated February 1996. Dr. Kennedy's letter, addressed "[t]o whom it may concern," leads that

> [Blanche] has a diagnosis of *Reactive Attachment Disorder.* Treatment for this condition is complex and requires combination of individual therapy, family therapy and possibly medication. The prognosis is guarded and consequently intensive therapy is warranted.

Significantly, Dr. Kennedy did not mention in the letter the Attachment Center or, more generally, treatment in Colorado. Despite the fact that the page of notes is unsigned and does not include Dr. Kennedy's name, the court will assume that Dr. Kennedy wrote these notes because the notes are dated in the same month that the Plaintiff visited Dr. Kennedy. Although most of the notes are illegible, the court can read the words "2 week" and "Colorado." The court will assume that these words refer to the two-week residential treatment program at the Attachment Center. However, the court is unable to decipher any mention of long-term residential treatment in Colorado, and will not assume that Dr. Kennedy referred the Plaintiff to the Attachment Center for such treatment. Importantly, there is no affirmative evidence before the court that Dr. Kennedy represented that long-term residential treatment at the Attachment Center is covered by the Plan. Therefore, the doctrine of equitable estoppel is not applicable to the Plaintiff's ERISA action for two separate reasons: (1) the Plan's mental health provisions regarding coverage limitations are unambiguous; and (2) an alleged referral by Dr. Kennedy, as shown by the affirmative evidence before the court, does not interpret these provisions even if they were ambiguous.

Even if the court were to find that Dr. Kennedy's alleged referral interprets, and does not modify, an ambiguous provision in the Plan that is relevant to coverage of the long-term residential treatment, the Plaintiff has not shown reasonable detrimental reliance on the alleged referral. As stated, MHN sent a letter dated March 28, 1996 to the Bushes stating that MHN would pay the total amount of the Plaintiff's treatment in Memphis, $1,650.00, less four $20.00 co-payments, but would not pay for the Attachment Center treatment. This letter repeats the previous denials by the Defendants of the Bushes' request for payment of the Attachment Center treatment. Importantly, this letter is dated before the Bushes brought the Plaintiff in April 1996 to the Attachment Center for the two-week residential treatment and long-term residential treatment programs. Thus, any alleged detrimental reliance by the Plaintiff on Dr. Kennedy's alleged referral would not be reasonable because the Plaintiff knew or should have known before entering the long-term treatment program that the Defendants would not authorize payment for this treatment. Therefore, the Defendants are not estopped from denying benefits for the Plaintiff's long-term residential treatment at the Attachment Center.

In sum, the Plaintiff is not entitled to recover any payment for the long-term treatment at the Attachment Center under the terms of the Plan. The court does not find that the alleged ERISA violations or the doctrine of equitable estoppel change this determination.[9] Accordingly, the Defendants' Motions for Summary Judgment on the Plaintiff's ERISA claim to recover benefits are due to be GRANTED.

### B. *Count Ten–The Claim Based on Failure to Provide a Copy of the Plan*

In Count Ten, the Plaintiff brings a claim to recover against the Defendants a copy of the Plan in effect at all relevant times, a fine

---

**9.** Because of this holding, the court does not need to discuss Moret's assertion that he is not liable in his individual capacity.

of up to $100.00 per day from November 6, 1995 through July 31, 1996, and reasonable attorney fees and costs. The Defendants contend that there is no material issue of fact and they are entitled to judgment as a matter of law.

29 U.S.C. § 1024(b)(4) requires that a plan administrator give a participant or beneficiary a copy of an employee benefit plan upon written request.[10] A participant or beneficiary may bring a civil action for the relief provided for in § 1132(c). 29 U.S.C. § 1132(a)(1)(A). Section 1132(c) provides, in part, that

> Any administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) ... within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1)(B).

▆ In determining whether a plaintiff is entitled to a civil penalty against a plan administrator or fiduciary for failure or refusal to provide requested information, "the trial court may undoubtedly consider whether a denial of information prejudiced a plaintiff, but prejudice is not a prerequisite to an award of civil penalties."*See Curry v. Contract Fabricators Inc. Profit Sharing Plan,* 891 F.2d 842, 847 (11th Cir.1990) (citations omitted). The civil penalty " 'is in the nature of punitive damages designed more to punish the intransigent administrator and to teach ERISA fiduciaries a needed lesson than to compensate the petitioner for actual loss.' " *Daughtrey v. Honeywell Inc.,* 3 F.3d 1488, 1494 n. 11 (11th Cir.1993) (quoting *Sandlin v. Iron Workers Dist. Council,* 716 F.Supp. 571, 574 (N.D.Ala.1988), *aff'd mem.,* 884 F.2d 585 (11th Cir.1989)). Although bad faith by an administrator or a fiduciary is relevant in

determining whether to impose a civil penalty, the "mere absence of bad faith" does not excuse the failure to provide timely information. *See Id.* at 1494(citation omitted).

In this case, Billy Bush stated by affidavit that he first requested a copy of the Plan on November 8, 1995. However, Billy Bush did not state from whom he requested a copy and that the request was made in writing. The Bushes' letter dated December 29, 1995 to MHN and Human reads, in part, that

> Since we received your letter [dated November 1, 1995], we have made repeated attempts to secure a copy of [the Plan]. We made telephone calls to the Mental Health Network, to the Humana Health Care Plans office, and to the HMO office. We have even asked our attorney to call and request a copy.

The Bushes have not submitted or pointed to any affirmative evidence that they requested in writing a copy of the Plan.

▆ Despite the lack of affirmative evidence of a written request, the December 29, 1995 letter reads that on December 19, 1995 Doehrman faxed the Bushes three pages of a benefit plan, which are identical to the mental health provisions of the Plan. Humana could not provide the Bushes with a written version of the Plan because Columbia would not approve the Plan despite Humana's requests to do so. (Carmony Deposition; Doehrman Affidavit.) Humana's failure to timely give the Bushes a written version of the Plan "resulted from matters reasonably beyond the control of [Humana]." *See* 29 U.S.C. § 1132(c). *See also Holman v. K-Mart Corp.,* 831 F.Supp. 836, 840 (M.D.Ala. 1993). The Plaintiff did not submit or point to any evidence suggesting any of the Defendants engaged in fraud, wantonness, deceit, active concealment, or bad faith in failing to timely give the Bushes a copy of the Plan. Imposing a civil penalty on any of the Defendants would not further the penalty's punitive purpose.

Additionally, in or about December 1994 the Bushes had the Brochure, which lists mental health benefits no greater or less

---

**10.** The Plaintiff's citation of Alabama law is inappropriate because her ERISA claim in Count Ten

is brought under federal, not state, law.

than those in the Plan. Also, the terms of the Plan are identical to those of the employee benefit plan that Billy Bush had in 1994. Furthermore, the excerpt of mental health provisions that Doehrman faxed to the Bushes on December 19, 1995 are the same as those found in the Plan. Importantly, the Plaintiff did not go to the Attachment Center until April 1996, well after the Bushes had the above materials. Thus, the Plaintiff was not unduly prejudiced by not receiving a written copy of the Plan in a timely manner. Accordingly, there is no material issue of fact which affects this claim, and the court will not use its discretion under § 1132(c) to impose a civil penalty on any of the Defendants.

In a claim under § 1132(c), a court also has discretion to allow "reasonable attorney's fees and costs of action to either party" 29 U.S.C. § 1132(g)(1). The Eleventh Circuit articulated five factors for courts to consider when deciding a request for attorney's fees:

"(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions."

*Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.,* 41 F.3d 1476, 1485 (11th Cir.1995) (quoting *Freeman v. Continental Ins. Co.,* 996 F.2d 1116, 1119 (11th Cir.1993)), *cert. denied,* 514 U.S. 1128, 115 S.Ct. 2002, 131 L.Ed.2d 1003 (1995). " '[No] one of these factors is necessarily decisive, and some may not be apropos in a given case, but together they are the nuclei of concerns that a court should address.' " *Freeman,* 996 F.2d at 1119 (quoting *Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Constr. Co., Inc.,* 932 F.2d 1443, 1452 (11th Cir.1991)) (internal quotation omitted).

 Here, the court does not consider it appropriate to award the Plaintiff attorney's fees and costs. First, as stated, the court has not found any affirmative evidence indicating any fraud, wantonness, deceit, active concealment, or bad faith by any of the Defendants. Second, no affirmative evidence has been submitted regarding any of the Defendants' abilities to satisfy an award of attorney's fees. Third, because the Plaintiff has failed to show any fraud, wantonness, deceit, active concealment, or bad faith by any of the Defendants, an award of attorney's fees would not deter others involved in similar circumstances. Fourth, there is no affirmative evidence that the Plaintiff sought to benefit other beneficiaries or participants of the Plan, and this case does not involve a significant legal question regarding ERISA. Lastly, the court has found against the Plaintiff on her two ERISA claims. For these reasons, the court will deny the Plaintiff's request for attorney's fees and costs.

Therefore, based on the undisputed evidence, the court, using its discretion, will not impose a civil penalty against any of the Defendants and will not award the Plaintiff with attorney's fees and costs.[11] The Plaintiff's request for a copy of the Plan in effect at all relevant times is moot because there was no written version of the Plan from January 1995 through August 1996. Accordingly, the Defendants' Motions for Summary Judgment on the Plaintiff's claim relating to failure to provide a copy of the Plan are due to be GRANTED.

## V. CONCLUSION

For the foregoing reasons, the Defendants' Motions for Summary Judgment are due to be GRANTED.

A separate order will be entered in accordance with this Memorandum Opinion.

---

**11.** It is, thus, unnecessary for the court to address the Defendants' arguments that they are not liable to the Plaintiff because they allegedly were not administrators or sponsors of the Plan.