**Randolph LUTON, Plaintiff,**

v.

**PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.**

**No. 988504CIVGOLD.**

United States District Court, S.D. Florida.

March 23, 2000.

**1366**

Alan P. Woodruff, Cape Coral, FL, Randall W. Henley, West Palm Beach, FL, for Plaintiffs.

Mark W. Zelek, Miami, FL, for Defendants.

### ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF

GOLD, District Judge.

THIS CAUSE is before the court upon Plaintiff's Motion for Summary Judgment [D.E. 35] and Defendant's Motion for Summary Judgment [D.E. 55]. Plaintiff initiated this suit on July 22, 1998, for legal and equitable relief under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* Jurisdiction is invoked pursuant to 29 U.S.C. § 1132, civil enforcement under ERISA, and 28 U.S.C. § 1331, as arising under federal law.

Plaintiff in this case is seeking a reversal of defendant's termination of plaintiff's disability payments. In a previous order, dated December 15, 1999, the court determined that a heightened arbitrary and capricious standard of review applies in this case. Before the court at this time is the issue of whether plaintiff's disability benefits were properly terminated under the Long Term Disability Plan provision limiting benefits for total disability "caused at least in part by a mental, psychoneurotic or personality disorder."[1] After careful

---

1. The Long Term Disability Plan states that "if your Total Disability, as determined by Prudential, is caused at least in part by a mental, psychoneurotic or personality disorder ... benefits are not payable for your Total Disability for more than 36 months." Pl.Ex. 1, D115. The Summary Plan Description states that "[i]n general, our disability benefits under the [Long Term Disability] Plan are not payable for more than 36 months if your total disability is caused by a mental, psychoneurotic or personality disorder." Pl.Ex. 2, D12.

consideration of the parties' arguments, the relevant case law, and the record as a whole, the court concludes that summary judgment should be granted in favor of the plaintiff.

## I. Factual and Procedural Background

Plaintiff is a former stockbroker and Senior Vice President of Prudential Securities, Inc. [Luton Dep. p. 9], and was, during his employment, entitled to disability benefits under a Long Term Disability Plan (the "Plan") [Plaintiff's Exhibit 1] insured by Group Insurance Contract GW–16171, issued by Prudential Life Insurance Company of America. The Plan is further described in a Summary Plan Description entitled "Disability Programs" [Pl.Ex. 2]. The Plan is sponsored, maintained, and administered by Prudential Securities, Inc. [Pl.Ex. 14, 15, & 16]. All determinations with respect to plaintiff's disability claim were made by Prudential Insurance Co. of America [Pl.Ex. 16].

Plaintiff was initially disabled on May 15, 1994 [Pl.Ex. 3]. Prior to this date, there was a very stressful incident with a Prudential client in which plaintiff was accused of fraud and of losing millions of dollars [Luton depo. p. 19–20; SSA Disability Determination form, 3/16/96, p. D368]. The plaintiff became ill at work and was placed in the hospital [SSA Disability Determination Form, 3/16/96, p. D368]. Luton's Disability Benefit Claim Form, executed in June, 1994, states the nature of his sickness to be "chest pain ... due to job related stress," and notes that plaintiff began seeing Dr. Zoraida Navarro, an internist, on May 16, 1994, and Dr. Thomas J. Schvehla, an adult psychiatrist and neurologist, on May 23, 1994. *Id.* In a letter dated May 23, 1994, Dr. Navarro wrote that she has been treating Luton for "high blood pressure that has been very difficult to control, and also for chest pain," and recommended that Luton stop working immediately as to not worsen his condition [Pl.Ex. 4]. Echocardiograms on May 25, 1994 and June 23, 1994 were negative [Dougherty Aff., p. D165 & D192]. A neurological examination on June 28, 1994

with Dr. Louis Bello found mild cognitive deficits due to stress and leading to depression, and recommended a demential work-up [*Id.* at D197]. An MRI of plaintiff's brain on July 6, 1994 was normal [*Id.* at D200].

On September 19, 1994, Dr. Schvehla noted in his Progress Note that plaintiff was taking Zoloft and Xanax, but that "his concentration and memory remain profoundly impaired" and that he "continues to be profoundly depressed," concluding that "[h]e is totally physically disabled." [Pl.Ex. 5]. On September 21, 1994, Dr. Navarro wrote that plaintiff was seen for "continued problems with dementia and loss of short term memory... Despite feelings from his psychiatrist that this is only due to depression it this (sic) my opinion that in fact patient is suffering from a severe encephalopathy and needs reevaluation and neuropsyche testing to ascertain that cause and prognosis of this disease." [Pl.Ex. 4]. On October 11, 1994, Dr. Dennis Feinrider wrote to Dr. Navarro that the MRI, EEG and spinal fluid analysis of Luton are all normal, and that a neuropsychiatric examination is necessary to determine if his symptoms are organic or non-organic [Dougherty Aff., p. D249]. A comprehensive neuropsychological examination was conducted by Dr. David Bush on November 7–8, 1994, after which Dr. Bush concluded that Luton's low test results were due to weak test effort and motivation to perform poorly, and that he does not suffer from neurodegenerative dementia [*Id.* at D265]. Dr. Bush diagnosed Luton as significantly depressed [*Id.*].

In a letter dated March 29, 1995, Dr. Navarro states that Luton suffers from severe hypertension, cognitive deficiencies, severe depression, progressive cognitive decline, memory loss and disorientation. *Id.* Dr. Navarro concludes that "Based upon my examination and treatments, it is my medical opinion that Mr. Luton will never be able to return to the type of employment in which he was previously."

*Id.* Progress Notes from Dr. Schvehla on October 24, 1994, January 6, 1995, and August 3, 1995 report continued high blood pressure and depression. [Pl.Ex. 5]. Plaintiff's treating physician switched from Dr. Navarro to Dr. Arnold Bolisay, whose out-patient records between August 3, 1995 and March 6, 1997 consistently diagnose Luton with hypertension and depression [Luton depo. p. 45–46; Dougherty Aff., D281–D339]. An Echocardiogram on August 28, 1996 and an EEG on January 6, 1997 were normal [Dougherty Aff., p. D315 and D326]. A Neuropsychological Evaluation on August 13, 1997 by Dr. Sharon Theroux diagnosed Luton with major depressive disorder and stated that his poor performance in the tests was believed to be volitionally produced [Theroux depo., p. SH29].

The defendant initially confirmed that plaintiff was totally disabled under the terms of the Plan and described his benefits in a letter dated December 16, 1994 [Pl.Ex. 6]. The letter did not state the basis for the finding of total disability, and did not indicate that benefits were limited in any way. The first indication plaintiff received that benefits might be limited in duration was an October 3, 1995 letter from defendant, which stated that: "Since you went out of work May 17, 1994, due to chest pain and uncontrolled blood pressure related to job stress, a Mental and Nervous condition, the contract states if your total disability, as determined by Prudential is caused at least in part by a mental, psychoneurotic, or personality disorder (including alcoholism and drug abuse), benefits are not payable for your total disability for more than thirty-six months." [Pl.Ex. 7].

By letter dated July 1, 1997, defendant terminated plaintiff's disability benefits effective July 16, 1997 pursuant to the Benefit Limitation clause of the Plan that limits benefits for disabilities "caused at least in part by a mental, psychoneurotic or personality disorder." [Pl.Ex. 1 & 8]. The letter stated: "You initially went out of work on May 17, 1994, as a First Vice President of Investments due to depres-sion, and have not since returned to work." [Pl.Ex. 8].

Plaintiff appealed the defendant's termination of his disability benefits [Pl.Ex. 9]. As part of the appeal, plaintiff submitted current opinion letters from two of plaintiff's doctors who were still providing treatment, Dr. Thomas Schvehla and Dr. Zoraida Navarro [*Id.*]. Dr. Schvehla wrote that he has been treating Luton since 5/24/94, and that Luton suffers from "major depression severe without psychotic features and panic disorder[,] . . . secondary to a heart condition that Mr. Luton was initially diagnosed with in 1994." Dr. Navarro referenced her May 23, 1994 letter in which she concluded that Luton was totally disabled based upon his family history of sudden heart attacks resulting in death and his current condition of high blood pressure and his coronary artery disease, concluding that her opinion that Luton cease all work is based on his physical condition, despite his single episode of depression.

Defendant submitted plaintiff's medical documentation, including the exhibits submitted by plaintiff in his appeal, for review by Rodney Falk, M.D., director of cardiac research at Boston Medical Center, on April 24, 1998. Dr. Falk was asked to address the questions: Was there a cardiac and/or hypertensive impairment as of July 15, 1997, the date at which he reached the mental nervous limitation and the claim was terminated? If yes, what was the impairment and what was the severity? Does he have any impairment now? If not, what would prevent him from returning to work, exclusive of his psychiatric diagnoses? [Pl.Ex. 10]. The records reviewed by Dr. Falk included records of Zoraida Navarro, M.D., Internist, records of Thomas Schvehla, M.D., Psychiatrist, records of Arnold Bolisay, M.D., internist, several attending physician statements, claimant's statements to the Florida Department of Labor regarding his disability, and reports of extensive out-patient medical testing [Dougherty Aff. Ex. D000453].

Dr. Falk concluded that there was no cardiac reason for Luton's permanent disability. Noting that Luton's labile (variable) hypertension was controlled with relatively small doses of medications and that stress tests were repeatedly negative, Falk found that Dr. Navarro's determination that Luton suffered from coronary artery disease was not supported by the medical records and relied on faulty risk factor assumptions.

On May 27, 1998, defendant denied plaintiff's appeal [Pl.Ex. 11]. The letter of denial stated that plaintiff "ceased working on May 17, 1994 due to depression," reviewed plaintiff's medical record and the findings of Dr. Falk, and concluded that "Mr. Luton's heart condition, or any other physical condition, does not render him Totally Disabled under the terms of the Group Policy" and that the Benefit Limitation does apply to plaintiff's claim [*Id.*].

## II. Standard of Judicial Review

### A. Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes entry of summary judgment where the pleadings and supporting materials demonstrate there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it is a legal element of a claim under the applicable substantive law and is one that might *affect* the outcome of the suit under the governing law. *See id.* An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party asking for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, the nonmoving party must make an affirmative presentation of specific facts showing a genuine issue exists, and may not rely only on the general allegations of the pleadings. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 (1986). A mere scintilla of evidence is insufficient to defeat a motion for summary judgment. *Id.* at 251, 106 S.Ct. at 2511. In reviewing a motion for summary judgment the court focuses on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997) (quoting *Anderson, supra*).

In resolving the present cross-Motions for Summary Judgment, the court will construe the facts in the light most favorable to the nonmovant when the parties' factual statements conflict or inferences are required. *Barnes v. Southwest Forest Industries*, 814 F.2d 607, 609 (11th Cir.1987).

### B. Standard for Reviewing the Benefits Decision under ERISA

Although ERISA does not provide district courts with a standard by which to review benefits decisions by a plan administrator or fiduciary, the Supreme Court has held that a denial of benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). The Eleventh Circuit has interpreted this to mandate an arbitrary and capricious standard of review, which is often used interchangeably with an abuse of discretion standard, if the administrator has discretionary authority to make eligibility determinations or to construe disputed terms of the plan. *See Jett v. Blue*

*Cross & Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir.1989). To trigger this standard of review, the language conferring discretion on the administrator must be "express language unambiguous in its design." *Kirwan v. Marriott Corp.*, 10 F.3d 784, 789 (11th Cir.1994) (citations omitted). If the administrator suffers from a conflict of interest in rendering its determination, a heightened arbitrary and capricious standard is appropriate. *See Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1449 (11th Cir.1997).

On December 16, 2000, the court issued an Order Determining Standard of Review [D.E. 103] which held that the appropriate standard of review for evaluating defendant's plan interpretations and factual determinations is heightened arbitrary and capricious. That Order examined language in the Plan stating that "[t]his Section applies if your Total Disability, as determined by Prudential, is caused at least in part by a mental, psychoneurotic or personality disorder," [Pl.Ex. 1, p. D72], as well as the introduction to the Summary Plan Description, which states that "[Prudential has] the responsibility, discretion and authority to interpret the Programs (including, but not limited to, questions concerning eligibility and benefit determinations)" [Pl.Ex. 2, p. D2]. Looking at all the documents as a whole, the court found that enough authority had been granted to Prudential to construe undefined terms of the plan to make the arbitrariness standard applicable. *See Cagle v. Bruner*, 112 F.3d 1510, 1517 (11th Cir.1997). However, because Prudential is both paying benefits under the disability plan and serving as the fiduciary making discretionary decisions, it was determined that the heightened arbitrary and capricious standard is appropriate. *See Brown v. Blue Cross and Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1561 (11th Cir.1990).

To apply the heightened arbitrary and capricious standard, the court must first determine whether the plaintiff "has proposed a 'reasonable' interpretation of the plan under which he could be cov-

ered." *Florence Nightingale Nursing Service, Inc. v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1481 (11th Cir.1995) (quoting *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1550 (11th Cir.1994)). If the court finds that plaintiff has advanced a reasonable interpretation, then under contra preferentem, which requires ambiguities in a document to be construed against the drafter, the plaintiff's interpretation is taken as correct. *Florence Nightingale*, 41 F.3d at 1481. The burden then shifts to the defendant to prove that its interpretation of the plan was not tainted by self-interest. *Id.* The defendant can discharge its burden by showing that its wrong but reasonable interpretation benefits the class of all participants and beneficiaries. *See Callough v. E.I Du Pont de Nemours*, 941 F.Supp. 1223, 1228 (N.D.Ga. 1996) (citing *Brown*, 898 F.2d at 1566–67). If the administrator does manage to carry this burden, the claimant may still succeed if the administrator's action was arbitrary and capricious by other measures. *See Brown*, 898 F.2d at 1568; *Lake v. UNUM Life Ins. Co. of Am.*, 50 F.Supp.2d 1243, 1253 (M.D.Ala.1999).

### III. Discussion

#### A. Reasonableness of Plaintiff's Proffered Interpretation

As specified above, under the heightened arbitrary and capricious standard of review, the court must first determine whether the claimant has proposed a reasonable interpretation of the plan under which he could be covered or whether the administrator's interpretation is correct. *See Florence Nightingale Nursing Service, Inc. v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1481 (11th Cir.1995). When construing the terms of an ERISA policy, ambiguity exists if the policy is susceptible to two or more reasonable interpretations that can fairly be made, and one of these interpretations results in coverage while the other results in exclusion. *See Rapp v. Foundation Health*, 1999 WL 1457224 at *4 (S.D.Fla.1999) (citing *Dahl–Eimers v.*

*Mutual of Omaha Life Ins. Co.*, 986 F.2d 1379 (11th Cir.1993). Under ordinary principles of contract interpretation, the court must first examine the natural and plain meaning of the plan's language. *Id.* If the plan provisions are ambiguous, the rule of *contra preferentem* requires the ambiguities be construed against the drafter. *Lee*, 10 F.3d at 1551. However, the court will not artificially create ambiguity where none exists. *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 308 (7th Cir.1992).

██ In this case, the plaintiff argues that a disability caused by depression is not a disability due to a "mental, psychoneurotic or personality disorder" as defined in the policy because he asserts that depression is caused by a chemical imbalance that is organically or physically based. Defendant argues in response that such a reading is contrary to a lay person's understanding of the plain meaning of the language and is contrary to the definition of mental disorder found in the *Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition (DSM–IV). The court finds that as a matter of law, the definition of "mental, psychoneurotic or personality disorder" is ambiguous, and that plaintiff has presented a reasonable interpretation of the terms.

Several federal courts outside of the Eleventh Circuit have had occasion to consider terms such as 'mental illness' or 'mental disorder' in the context of ERISA benefit plans. The Fifth and Eighth Circuits have found the terms to be unambiguous, and defendant has directed the court to cases within those circuits. *See Tolson v. Avondale Indus., Inc.*, 141 F.3d 604 (5th Cir.1998); *Lynd v. Reliance Standard Life Ins. Co.*, 94 F.3d 979 (5th Cir.1996); *Stauch v. Unisys Corp.*, 24 F.3d 1054 (8th Cir.1994); *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150 (8th Cir.1990). The Eighth Circuit in *Brewer*, under an apparently de novo review,[2] examined a dispute over policy limits for care of "mental illness," where mental illness was not defined in the policy. The plaintiff had been diagnosed as suffering from 'affective mood disorder,' which experts testified seemed to be biologically caused and was treated with drugs and psychotherapy. The *Brewer* court found that undefined terms in a policy "should be accorded their ordinary, and not specialized, meanings," and, because laypersons are inclined to focus on illness symptoms, found that illness symptoms and not etiology should be the focus of the court's inquiry. *Brewer*, 921 F.2d at 154. The Fifth Circuit adopted this approach in *Lynd* when it examined a plan administrator's decision to terminate disability benefits for an insured diagnosed with major depressive disorder.[3] The *Lynd* court found that the policy's limitation for "mental or nervous disorders" should be interpreted from a layperson's point of view based on the symptoms of the disease, and that this approach comports with the definitions of mental disorder in the DSM–IV. *Lynd*, 94 F.3d at 983. The Fifth Circuit in *Tolson* reaffirmed that "depression is a 'mental disorder,' irrespective of its physical causes or symptoms." *Tolson*, 141 F.3d at 609.

On the other hand, the Seventh and Ninth Circuits have consistently held that terms such as 'mental illness' or 'mental disorder' are ambiguous. *See, e.g., Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302 (7th Cir.1992); *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948 (9th Cir. 1993); *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938 (9th Cir.1995); *Lang v. Long-*

---

**2.** The *Brewer* court stated that "neither party's construction should be favored," and proceeded to interpret the meaning of the phrase 'mental illness.' *Brewer*, 921 F.2d at 154.

**3.** The *Lynd* court did not specify a standard of review, finding that "regardless of whether the district court reviewed the administrator's eligibility determination for abuse of discretion or de novo, the nature of Lynd's disability compelled the district court to conclude that Lynd's long-term disability benefits under the plan were properly terminated." *Lynd*, 94 F.3d at 981.

*Term Disability Plan of Sponsor Applied Remote Tech., Inc.,* 125 F.3d 794, 799 (9th Cir.1997); *see also Dorsk v. UNUM Life Ins. Co.,* 8 F.Supp.2d 19 (D.Me.1998). In *Phillips,* the Seventh Circuit was presented with a plaintiff diagnosed with congenital encephalopathy, an organic brain disorder manifested by behavioral disorders. The court examined language in the ERISA plan limiting benefit amounts for mental illnesses, where the plan provided no definition of the term 'mental illness,' under the de novo standard of review. The court stated that it had "no trouble" finding the term 'mental illness' to be ambiguous when applied to individuals who have mental disorders caused by organic illnesses. *Phillips,* 978 F.2d at 310–11. Similarly, the Ninth Circuit held in *Patterson* that the undefined term 'mental disorder' was ambiguous because the plan did not specify whether a mental disorder should be determined by looking to the cause or symptoms of the disability or whether a combination of the two could qualify as a mental disorder. *Patterson,* 11 F.3d at 950. This holding was reaffirmed in *Mongeluzo* and *Lang. Mongeluzo,* 46 F.3d at 942–43; *Lang,* 125 F.3d at 799. In fact, the *Lang* court stated that language limiting disability benefits 'caused or contributed to' by a 'mental disorder' "presents an almost classic ambiguity" with regard to whether it should be interpreted according to symptoms or to causes. *Lang,* 125 F.3d at 799. Furthermore, the District Court of Maine had occasion to analyze a situation similar to this one when it was presented with a plaintiff who suffered from obsessive-compulsive disorder (OCD) and who argued that the Plan's limitation of benefits for disabilities due to mental illness should not apply because OCD stems from organic causes. In that case, the court reviewed de novo language in the plan that defined mental illness as "mental, nervous or emotional diseases or disorders of any type." The *Dorsk* court discounted the Fifth Circuit's approach in *Lynd,* finding that it rendered the definition of 'mental illness' unreasonably broad and inappropriately relied on the language

of the DMS–IV to determine whether the language was ambiguous. *Dorsk,* 8 F.Supp.2d at 21–22. The court noted that overemphasis on symptoms and what a layperson would characterize as a mental illness ignores the fact that laymen do not generally rely on medical expertise to diagnose their disorders. Such an approach would render diseases such as Alzheimer's disease or brain cancer 'mental illnesses' because of their symptoms. In discounting the use of the DSM–IV, the court reasoned that the Manual might be relevant in a factual determination of whether plaintiff's disorder falls within the contract language, but it's lack of reference in the policy renders it unhelpful in resolving language ambiguity. *Id.* The court found both parties' interpretations to be plausible, and therefore held the language to be ambiguous.

The only Eleventh Circuit opinion to address a similar issue is *Blake v. Unionmutual Stock Life Ins. Co. of Am.,* 906 F.2d 1525 (11th Cir.1990). The Eleventh Circuit adopted the reasoning of the district court, which found, under de novo review, that plaintiff's postpartum depression fell within the policy's mental illness limitations and was not a physically based illness with psychiatric manifestations. The district court concluded that because plaintiff failed to prove an organic causation for her illness, the fact that she was treated primarily by psychiatrists and had a preexisting condition was proof that she suffered a mental illness within the terms of the policy. *Blake,* 906 F.2d at 1530. The language of the *Blake* opinion suggests that if the plaintiff had been able to prove that her illness had a physical cause, the plan's mental illness limitation would not have applied to her condition, thus holding open the possibility that an organically-based illness would not be considered a mental illness. *See Phillips,* 978 F.2d at 309 ("Moreover, our reading of *Blake* leads us to conclude that had the plaintiff demonstrated an organic basis for her illness, the Eleventh Circuit may well have held

that the policy's mental illness limitation did not apply.").

In this case, the plaintiff has presented an affidavit from Dr. Paul Goodnick, a professor of psychiatry and behavioral sciences, stating that the majority of conditions commonly classified as 'depression' have their origins in chemical imbalances, are most properly characterized as organic or physical in nature, and are treated medically with appropriate drugs. Dr. Goodnick never personally examined Luton, but stated that he was advised that plaintiff was treated with commonly used anti-depressant drugs, and that this would suggest his condition would be commonly characterized as an organic or physical condition rather than a "mental, psychoneurotic or mood disorder." In response, defendant has submitted an affidavit from Dr. Park Dietz, a clinical professor of psychiatry and biobehavioral sciences, which states that the common practice in the psychiatric profession is to regard depression as a mental disorder, and that this practice is illustrated by depression's classification in the DSM–IV. Furthermore, Dr. Dietz opines that the fact that depression is being successfully managed through the use of drugs such as Xanax and Zoloft is irrelevant to the characterization of depression as a "mental, psychoneurotic or personality disorder." Dr. Dietz also did not review Luton's medical records.

In light of the dispute in the case law concerning the interpretation of plan language limiting benefits for 'mental illnesses' or 'mental disorders,' the Eleventh Circuit's leaving open the possibility that 'mental illness' could be interpreted to exclude organic or physically based illnesses, and the conflicting expert testimony in this case, the court concludes that the language of the Plan is ambiguous and that both parties have presented reasonable interpretations of "mental, psychoneurotic or personality disorder." Accordingly, under the principles of contra preferentem, ambiguities are construed against the insurer and the plaintiff's interpretation is taken as correct. *See Florence Nightingale*, 41 F.3d at 1481.

## B. Defendant's Burden to Prove Its Interpretation was not Influenced by Self–Interest

Once the plaintiff has established a reasonable interpretation for an ambiguous term in the plan, and that term has accordingly been construed against the drafter, the burden shifts to the plan administrator to prove that its interpretation of the plan was reasonable and not tainted by self-interest. *See Florence Nightingale*, 41 F.3d at 1481. As noted above, the plaintiff has sufficiently shown that its interpretation of the disputed terms of the plan was reasonable. The focus at this stage, therefore, is on whether the defendant can prove its decision was not tainted by self-interest. The defendant can discharge its burden by showing that its interpretation benefits the class of all participants and beneficiaries, by proving that its interpretation was "calculated to maximize benefits to participants in a cost-efficient manner." *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d at 1552; *Brown*, 898 F.2d at 1566–67; *Callough v. E.I. Du Pont de Nemours*, 941 F.Supp. 1223, 1231 (N.D.Ga.1996).

Defendant has submitted affidavits from Daniel G. Dougherty, a manager in Disability Management Services for Prudential, to support its contention that its interpretation was not tainted by self-interest. *See* Third and Fourth Affidavits of Daniel G. Dougherty. In essence, Dougherty states that the pricing of Plan premiums contemplates including depression within the 36 month benefit limitation for disabilities caused at least in part by a mental, psychoneurotic or personality disorder, and that expansion of the Plan by not subjecting such participants to the limitation would cause the price of the Plan to increase, thus possibly causing Prudential to cut back benefits, discontinue the plan, or raise premiums. Dougherty 3rd Aff.

The conclusory nature of this affidavit is unconvincing and fails to discharge the defendant's burden of showing its decision was untainted by self-interest. Defendant, as both the insurer and plan ad-

ministrator, had the opportunity to define the disputed terms within the Plan, but instead elected not to provide any illustration of the conditions that are included or excluded or to insert language as to whether the cause or the manifestation of an illness determines its coverage. *See Phillips*, 978 F.2d at 311. If defendant wishes the Plan to limit benefits for disabilities caused at least in part by mental disorders, and it wants mental disorders to include depression caused by chemical imbalances or any other physical, organic basis, it could clearly say so and amend the Plan accordingly. *See, e.g.*, Modification of the Group Contract, Pl.Ex. 1, p. D136. The defendant's submission of Dougherty's conclusory statement that Prudential's decision was not tainted or motivated by self-interest and that this interpretation would lead to cut backs in benefits and possible plan discontinuation is not well taken and fails to carry defendant's burden. Therefore, the court is compelled to grant summary judgment in favor of plaintiff in this case.

### C. Arbitrary and Capricious by Other Measures

▆ Even if the defendant had carried its burden of showing its interpretation of the Plan benefits the class of all participants and beneficiaries, the plaintiff has shown that the defendant's actions were arbitrary and capricious by other measures. *See Brown*, 898 F.2d at 1568. There is no substantive difference between the terms "arbitrary and capricious" and "abuse of discretion." *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1450 n. 2 (11th Cir.1997). When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard, "the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *Jett v. Blue Cross and Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir.1989).

▆ The defendant in this case is not entitled to rely on the "caused at least in part by" language contained in the Plan's benefit limitation for disabilities "caused at least in part by a mental, psychoneurotic or personality disorder" because of the conflict between this language and the more expansive wording of the Summary Plan Description. The SPD leaves out the 'at least in part by' statement, advising participants instead that disability benefits "caused by a mental, psychoneurotic or personality disorder are limited to 36 months."

The ERISA statute contemplates that the summary plan description will be an employee's primary source of information regarding employment benefits and employees are entitled to rely on the descriptions contained in the summary. *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907 (2nd Cir. 1990). A summary plan description must contain information regarding the circumstances which may result in disqualification, ineligibility, or denial or loss of benefits. 29 U.S.C. § 1022(b). "It would be 'grossly unfair to ... disqualify [an employee] from benefits if ... [the] conditions [which lead to the disqualification] were stated in a misleading or incomprehensible manner in the plan booklets.' " *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir.1991). The conflicting language in the SPD leads to a likelihood of misleading the average plan participant. In effect, this becomes a situation where "before a participant in the plan could make any use of the summary she would have to compare the summary to the policy to make sure that the summary was unambiguous, accurate and not in conflict with the policy." *Hansen*, 940 F.2d at 981. Therefore, the SPD controls the determination of the plaintiff's rights under the plan.

▆ There is no dispute in this case that the plaintiff is totally disabled under the plan. The issue instead focuses on the cause of that disability, which must be a mental, psychoneurotic or personality disorder in order for the benefit limitation to apply. The defendant's decision that

the plaintiff's disability was caused by depression was arbitrary and capricious because there were no reviewing doctors who diagnosed plaintiff's depression as *causing* his disability. The defendant, in reviewing the claim, sent plaintiff's medical records for review by a cardiologist on May 13, 1998 to rule out heart problems as the cause of plaintiff's disability as of July 15, 1997. Defendant's logic in conducting such a review was that ruling out a heart condition as the cause of plaintiff's disability would leave depression as the only possible cause, and depression would fall under the 'mental, psychoneurotic or personality disorder' limitation. However, without any medical proof that plaintiff's total disability was actually caused by a mental, psychoneurotic or personality disorder, making the assumption that the absence of sufficient proof that a heart condition is the cause of plaintiff's disability means depression is the sole cause was arbitrary and capricious. In sum, the evidence was not "adequate to support the conclusion reached by the decisionmaker." *Maida v. Life Ins. Co. of North Am.*, 949 F.Supp. 1087, 1091 (S.D.N.Y.1997).

### D. Reconsideration of The Court's January 10, 2000 Order

On January 10, 2000 the court issued an Order of Clarification; Denying Motion in Limine [D.E. 108] that denied the remand of this case to the plan administrator because the quantity of plaintiff's alleged procedural violations of the notice of termination requirements contained in labor regulation 29 C.F.R. § 2560.503–1(f) did not work a substantive harm. *See Bush v. Humana Health Plan of Ala., Inc.*, 973 F.Supp. 1376, 1382 (M.D.Ala.1997). Plaintiff has submitted a Motion for Reconsideration [D.E. 113], arguing that the alleged violations are substantive and not procedural, and thus subject to different analysis than that provided by the court.

The court has reviewed plaintiff's motion and finds that it is without merit. Although *Bush* involved alleged ERISA violations for failure to provide a written version of the plan to the beneficiary and not

violations of 29 C.F.R. § 2560.503–1(f), it's analysis concerning failure to turn over information to a plan beneficiary is analogous to this situation. In addition, at least one other court within the Eleventh Circuit that has examined alleged violations of 29 C.F.R. § 2560.503–1(f) has determined that substantive relief was not appropriate because there was no proof that the alleged notice violations caused any prejudice or harm. *See Payne v. Ryder System, Inc. Long Term Disability Plan*, 173 F.R.D. 537, 541 (M.D.Fla.1997).

Accordingly, it is

**ORDERED AND ADJUDGED** that Plaintiff's Motion for Summary Judgment [D.E. 35] is GRANTED and Defendant's Motion for Summary Judgment is DENIED [D.E. 55]. Judgment will be entered in favor of plaintiff by separate order. It is further

**ORDERED AND ADJUDGED** that Plaintiff's Motion for Reconsideration [D.E. 113] is DENIED. It is further

**ORDERED AND ADJUDGED** that a status conference will be held on **Monday, April 17, 2000 at 8:45 a.m.** before the Hon. Alan S. Gold, U.S. District Court, Southern District of Florida, Federal Courthouse Square, 10th Floor, 301 North Miami Avenue, Miami, Florida. On or before April 12, 2000, the parties shall each file and serve a status report addressing how they would like the court to proceed to resolve the remaining issues in the case.